**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| Brian K. Willis, *et al.*, | : |
| | : |
| Plaintiffs, | : Civil Action No.: 5:20-cv-60 |
| v. | : |
| | : **COMPLAINT** |
| Ford Motor Company, | : |
| | : |
| Defendant. | : |
| | : |

For this Complaint, Plaintiff Brian K. Willis and all Plaintiffs identified in <u>Exhibit A</u> to this complaint, by undersigned counsel, state as follows:

### PRELIMINARY STATEMENT

1.      This is not a class action, but a group action brought by owners and/or lessees of Ford Motor Company manufactured automobiles sold with defective and dangerous Takata airbags.

2.      An automotive component supplier that manufactures and sells airbags in automobiles and vehicle manufacturers must take all necessary steps to ensure that its products – which can literally mean the difference between life and death in an accident – function as designed, specified, promised, and intended.  Profits take a back seat to safety for the airbag manufacturer and the automobile manufacturer in making its product sourcing decisions.  Yet Takata Corporation, and its related entities ("Takata"), and Ford Motor Company ("Ford" and/or "Manufacturer") put profits ahead of safety.  Takata cut corners to build cheaper airbags, and Ford bought their airbags from Takata to save money.  The result is that instead of saving lives, faulty Takata airbags are killing and maiming drivers and passengers involved in otherwise minor and survivable accidents.  Even more alarming, rather than take the issue head-on and immediately do

everything in their power to prevent further injury and loss of life, Takata and Ford have engaged in a ten-year pattern of deception and obfuscation, only very recently beginning a complete recall of affected vehicles.

3.      Airbags are a critical component in the safety features of virtually every motor vehicle sold in the United States and throughout the world.  Currently, about 37,000 people are killed in motor vehicle accidents each year in the United States.  Remarkably, that number is nearly half of what it was in 1972, when over 54,000 Americans died in car crashes.  The drastic reduction is, in large part, due to tremendous advances in vehicle occupant safety, including the widespread use of seatbelts and airbags.

4.      In order to prevent serious injury and death resulting from bodily impact with the hard interior surfaces of automobiles, like windshields, steering columns, dashboards, and pillars, upon a vehicle experiencing a specified change in velocity in a collision, accelerometers and sensors in the vehicle frame trigger the vehicle airbags to deploy.  Because collisions can occur at rates of speed that can cause serious injury, to be effective, airbags must deploy timely and at appropriate velocity to be effective, but not subject the occupant to additional unnecessary harm. To accomplish this, the airbag system uses highly conductive metals, such as gold, and small explosive charges to immediately inflate the airbags upon being triggered.  This case flows directly from the now-admitted fact that Takata's explosive charge components in its airbag systems were defectively manufactured since as early as 2001, and perhaps earlier.

5.      Rather than deploying the airbags to prevent injuries, the defective Takata airbag inflators quite literally blew up like hand-grenades, deploying at excessive forces and in many incidents, sending lethal metal and plastic shrapnel into the vehicle cockpit and into the bodies of the drivers and passengers.

6. Takata and Ford knew of the deadly airbag defect at least 17 years ago, but did nothing to prevent ongoing injury and loss of life. Takata's first airbag defect recall stemmed from defective manufacturing in 2000, but was limited (by Takata) to a recall of select Isuzu vehicles. In Alabama, in 2004, a Takata airbag in a Honda Accord exploded, shooting out metal fragments which gravely injured the driver. Honda and Takata unilaterally deemed it "an anomaly" and did not issue a recall, adequately investigate themselves, or seek the involvement of federal safety regulators. Instead, they brushed it under the rug: Takata kept making defective airbags; and Honda and other vehicle manufacturers like Ford kept putting them in its vehicles while marketing them as highly safe and of high quality.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter pursuant to the Magnuson-Moss Federal Act, 15 U.S.C. § 2310(d)(1)(B), in that the Plaintiffs claim more than $50,000.00 in damages, exclusive of interest and costs, and under the doctrine of supplemental jurisdiction as set forth in 28 U.S.C. § 1367.

8. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Defendant is subject to personal jurisdiction in this District and where Defendant, as principal, directs and controls repairs of Ford-manufactured vehicles through its agents consisting of a dealership network located in this District.

9. Further, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the Plaintiffs' claims occurred within this District.

## PARTIES

10.    Plaintiff Brian K. Willis is an adult individual who resides in Raleigh, North Carolina, and purchased a 2005 Ford Mustang, Vehicle Identification Number 1ZVFT80N455143651.

11.    All Plaintiffs identified in <u>Exhibit A</u> were, at all relevant times, adult individuals who either reside in North Carolina or who purchased motor vehicles in North Carolina which were manufactured or sold by Defendant.

12.    Defendant Ford Motor Company (hereafter "Ford" or "Defendant") is a business entity with a principal place of business at One American Road, Dearborn, Michigan 48126.  At all relevant times, Ford engaged in the business of marketing, supplying, and selling motor vehicles accompanied by written warranties to the public at large through a system of authorized dealerships in the State of North Carolina and throughout the United States.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL PLAINTIFFS

13.    As used in this Complaint, "Defective Vehicles" refers to all vehicles purchased or leased in the United States that have airbags manufactured by Takata and have been subject to an airbag-related warning or recall, including, but not limited to, the following Ford manufactured vehicles:

- 2007-2010 Ford Edge

- 2006-2012 Ford Fusion

- 2005-2006 Ford GT

- 2005-2014 Ford Mustang

- 2004-2011 Ford Ranger

- 2007-2010 Lincoln MKX

4

- 2006-2012 Lincoln Zephyr/MKZ

- 2006-2011 Mercury Milan

14.     The Defective Vehicles contain airbags manufactured by Takata that, instead of protecting vehicle occupants from bodily injury during accidents, violently explode using excessive force, and in many incidents, expel lethal amounts of metal debris and shrapnel at vehicle occupants.

15.     All Takata airbags in the Defective Vehicles share a common, uniform defect:  the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators (the "Inflator Defect").  The inflator, as its name suggests, is supposed to inflate the airbag upon vehicle impact.  In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.

16.     "Defective Airbags" refers to all airbag modules (including inflators) manufactured by Takata that are subject to the recalls, all Takata airbags subject to any subsequent expansion of pre-existing recalls, and new recalls, relating to the tendency of such airbags to over-aggressively deploy, rupture, or fail to deploy.  All Defective Airbags contain the Inflator Defect.  As a result of the Inflator Defect, Defective Airbags have an unreasonably dangerous tendency to:  (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

17.     Airbags are meant to inflate timely, during an automobile collision but with only such force necessary to cushion the occupant from impact to the vehicle's interior and not cause

additional enhanced injury.  When people operate a motor vehicle or ride in one as a passenger, they trust and rely on the manufacturers of those motor vehicles to make those vehicles safe.

### I.      Takata Was a Major Manufacturer of Airbags and Inflators

18.      Takata was the world's second largest manufacturer of automotive safety devices, including airbags. Takata was one of the first companies to market driver-side airbags in the early 1980s.

19.      Takata supplied airbags to automakers for U.S. vehicles and to state and local governmental purchasers since at least 1983. By 2014, Takata had captured 22 percent of the global automotive airbag market.

20.      Takata manufactured, distributed, and sold Defective Airbags that can cause serious bodily injury or death; and intentionally concealed the foregoing from Plaintiffs and federal regulators.

### II.      Takata's Airbags Have A Common, Uniform Defect

#### A.      Takata Recklessly Chose An Inexpensive and Dangerous Propellant

21.      The part of the airbag at issue in this matter is the inflator. The inflator consists of a metal canister loaded with propellant wafers or pellets, and the inflator is placed in the airbag module.  Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag.  This process occurs within milliseconds.

22.      The following basic illustration, included earlier in the complaint as well, depicts Takata's airbag module:



23.     In the late 1990s, Takata shelved a safer chemical propellant in favor of ammonium nitrate, a far cheaper and more unstable compound that is much better suited for large demolitions in mining and construction.

24.     Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior ranging from inertness to violent combustion. When Takata decided to abandon the safer propellant in favor of the more dangerous but cheaper one, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan.  As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and it is better suited to large demolitions in mining and construction.

25.     From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks.  Indeed, Takata expressed concern in a patent document in 1996 that an

7

ammonium-nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up."  Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit.  Takata also noted that if ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or it *might even blow up* because of the excess pressure generated" (emphasis added).

26.    Takata further admitted in a patent document from 1999 that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

27.    In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington, raised objections and pointed to publicly available explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion. As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team was given only "a couple days" to do its review.

28.    Not surprisingly, other major airbag manufacturers, including Autoliv and Key Safety Systems, have reportedly avoided or abandoned using ammonium nitrate as a primary inflator propellant.  Indeed, Takata's representative confirmed at a Congressional hearing in June 2015 that Takata is the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

29.    The only conceivable advantage to using the ammonium nitrate compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap,

unbelievably cheap." Takata had originally planned to use tetrazole as its propellant, which is not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly. But tetrazole was too expensive for Takata, and Takata executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

30. Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over the years. Nevertheless, rather than switch to the compound it knew would be safer, even if more expensive, Takata opted to try, over the course of many years, to stabilize a compound that resists stabilization.

31. For example, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture." The 2006 patent document purportedly contained a fix for that sort of rupturing.

32. In a 2007 patent for allegedly phase stabilized ammonium nitrate that incorporates a scavenging additive designed to retain moisture in an effort to prevent these catastrophic inflator ruptures (also known as a desiccant), Takata representatives noted the following:

> Without the addition of the [additive], and as shown in [the patent], the ballistic curves indicate that changes occurred in the gas generant after 50 cycles. After 100 cycles the ballistic performance was very aggressive and did not meet USCAR specification. After 200 cycles the ballistic performance was so aggressive that the inflator ruptured due to extremely high internal pressures.

33. Thus, Takata's inflators were "grenades" in the glove box or steering wheel waiting to detonate after going through 100 or 200 cycles of thermal cycling, which, of course, is something cars in the real world will eventually do.

34.     The use of this additive (or any other) designed to address ammonium nitrate's hygroscopic nature (affinity for moisture) is, at best, a temporary fix because at some point the additive will no longer be able to absorb the excess moisture and the ballistic curves will again exceed specification leading to ruptures.

35.     Takata submitted another patent application with purported "fixes" for ammonium-nitrate propellant as recently as 2013.  These ongoing, albeit unsuccessful, efforts show that Takata knew, and disclosed to industry participants like Ford, throughout the relevant period that its airbags were defective.

### B.  The Risks of the Inflator Defect Were Exacerbated by Takata's and Ford's Abysmal Quality Control

36.     Takata and Ford became further aware of the instability of its ammonium-nitrate propellant from the persistent and glaring quality control problems that Takata encountered in its manufacturing operations.  The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico.

37.     Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail.  Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*.  On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations.  In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.

38.     Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant. Ford was made aware of this incident soon after it occurred.

39.     Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium-nitrate propellant from failing.

40.     Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

41.     Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags. Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium-nitrate propellant. In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!" This shoddy and reckless attitude permeated all of Takata's operations and facilities.

42.     Yet handling problems at Takata facilities persisted. A manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped . . . . Here you can see why it is important to handle our product properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The

11

presentation included a link to a video that appeared to show a side-curtain airbag deploying violently, sending an airbag inflator hurtling into the car's cabin.

### III. Ford's Knowledge of the Inflator Defect

#### A. Ford Knew Takata Was Using Ammonium Nitrate in the Propellant in Its Inflators from the Inception

43.     At all relevant times, Ford exercised close control over its suppliers, including airbag and airbag-inflator suppliers.  Ford prepared and maintained design specifications for both the airbag and inflator, which suppliers like Takata were and are required to meet.

44.     Ford, along with other U.S. auto makers, developed uniform specifications known as the USCAR (United States Council for Automotive Research) Specifications for airbags to be used in its vehicles.  The purpose of the USCAR Specifications was, among other things, to set uniform safety standards for component parts such as airbags.

45.     The USCAR Specifications issued by 2002 have more stringent requirements in the event that an airbag manufacturer seeks to use ammonium nitrate in its propellant in the airbag inflator.  Among other things, the supplier was required to provide evidence to Ford of the propellant's burn rate stability and proof that it had been phase-stabilized – requirements that did not apply to other types of propellants.  These unique requirements applicable to ammonium nitrate propellants demonstrate Ford's clear understanding – well before it purchased Defective Airbags from Takata – of the risks inherent in placing ammonium nitrate within metal containers just a few feet from vehicle occupants.

46.     In what Ford refers to as "bookshelving," the process by which Ford initially approves of new technologies from component suppliers, Ford closely reviewed Takata's proposed airbag designs.  The "bookshelving" process is intended to act as the "guardians at the gate."  From

12

the beginning of this "bookshelving" process, Ford was fully aware that Takata intended to use an ammonium nitrate-based propellant.

47.     Ford's own inflator expert refused to "bookshelf" Takata's inflators because of their use of the ammonium-nitrate-based propellant.  Ford nevertheless approved the use of Takata's inflators made with ammonium-nitrate propellant in or around September 2000.  Before the Takata inflators could be used in specific Ford models, the specific inflators to be used would still need to undergo design validation (DV) testing and production validation (PV) testing as well.  Ford first installed Takata inflators (the SDI) in its 2004 model year Ford Ranger.

## B.  Ford Knew Takata's Inflators Could Not Meet Ford's Own Specifications, But Repeatedly Granted Takata "Deviations" to Allow Them to be Used Anyway

48.     Although Ford participated in the development of the USCAR Specifications to establish uniform safety requirements for the protection of its customers, Takata was repeatedly unable to meet the specifications in a variety of categories.  This was a continuing source of discussion between Ford and Takata, and resulted in efforts to avoid the application of the USCAR Specifications.

49.     For example, in an October 2003 fax to Takata, a Ford engineer queried whether they could avoid meeting the USCAR Specifications for certain airbag inflators, saying: "We found a loop hole where we do not need to meet USCAR since the spec[ification] was not release[d] when we signed the SOW [Statement of Work]."

50.     In 2004, Ford was aware that Takata's inflators could not meet the USCAR Specifications for a number of different models and in a number of different areas.  Among other areas, Takata inflators were failing the USCAR Specifications requirements for ballistic variability and heat aging (a test designed to replicate the performance of the inflator after it has spent time

in the field). The failure of Takata's inflators to meet the USCAR Specifications generated grave concerns for meeting production deadlines for Ford vehicles, as Ford would not have been able to manufacture and sell vehicles unless it equipped them with airbags.

51. Although Ford required Takata to put forward plans and matrices for bringing their inflators into compliance with the USCAR Specifications, these plans showed that it would be years before Takata could produce a fully-compliant inflator.

52. Takata's inability to meet USCAR Specifications led one senior Ford engineer, as early as August 2004, to threaten: "If I ever see another bag integrity issue (e.g., bag tear, burst, comb etc.), I will have Takata desourced on all future programs (including current ones)." Yet Ford continued to see bag integrity issues and worse with Takata, but never followed through on its threat to "desource" Takata. To the contrary, Ford dramatically increased its business with Takata.

53. Ford was under pressure to use Takata's inflators to keep to production schedules for certain of its vehicles. For example, in November 2004, when Ford engineers in its Core Engineering department refused to approve Takata's defective inflators for use in Ford vehicles, Takata went "up the ladder at Ford" and collaborated with Ford's senior management to "override" the engineer's informed judgment. Without Takata's inflators, Ford would not have had airbags to install in its vehicles, which would have thrown off Ford's production schedules. So Ford again granted Takata the specification deviations it needed, and the Defective Airbags continued being used in Ford's vehicles.

54. A Ford engineer would later admit that Ford's own inflator expert had been opposed to the use of ammonium nitrate because of phase stability concerns and moisture sensitivity, but that he had been overruled by that same higher level Ford safety engineer. The Ford engineer also

commented that he likewise had accepted the use of ammonium nitrate in the past because he had "a gun to his head" – meaning Ford would be unable to manufacture and sell vehicles in time unless it accepted airbags that it knew failed to meet crucial safety specifications.

55.     In 2005, Takata's inflators still required deviations from the USCAR Specifications.   And Ford continued to grant the deviations, including deviations from the specifications for ballistic variability, for vehicles that would be launched in model years 2007 and 2008.

56.     By 2007, Ford had set up an "Inflator Jury Review" process to deal with Takata's continued need for deviations from the USCAR Specifications.   Takata was the only airbag supplier for which Ford used this process.   Describing the purpose of the process to Takata, a Ford engineer explained: "Basically the purpose of the new requirement is to allow you to sell us on why we should accept an inflator that does not meet our requirements … Think of yourself as a car salesman trying to convince a potential customer to purchase a vehicle that does not meet all of their wants."

57.     Takata passed the "Jury Review" and Ford chose to continue accepting and selling inflators that did not meet its requirements.

### C.  Ford Knew Ruptures Had Occurred During Takata's Testing of Inflators

58.     Ford was fully aware that there had been multiple ruptures of Takata inflators intended for use in Ford vehicles during pre-production testing of the inflators by Takata.

59.     Specifically, Ford took steps to use a new model of Takata inflator (known as the PSDI-5) that also used the ammonium nitrate-based propellant supplied for its Ford Fusion vehicles.   Before the Takata inflators could be supplied to Ford, they needed to complete both DV

testing – testing which validates the design of prototypes of the inflator – and PV testing –testing which validates the final production version of the inflator.

60.     Takata told Ford that its inflators had experienced ruptures during both DV testing and PV testing.  In fact, in November 2004, Takata reported that, after conducting "post sequential environment" testing – testing that is designed to replicate how the inflator will perform after time spent on the road – 12 out of 52 inflators experienced "structural compromise" (i.e., a rupture) during DV testing (a failure rate of almost 1 in 4), and that an additional 2 inflators ruptured during PV testing.

61.     Ford had never experienced ruptures before with any other supplier's inflators during design validation (DV) or production validation (PV) testing.

62.     Takata's conclusion on the root cause of the ruptures was that moisture trapped inside the auto-ignition tablets in the inflator during production was somehow released and degraded the propellant during post-environmental testing.  The moisture affected the propellant by causing it to have a lower density that created a larger surface area during ignition, which in turn resulted in a higher burning rate for the propellant tablets.  This higher burning rate led to the ruptures.  Ford was thus aware, no later than 2004, that Takata's inflators were prone to rupture when the ammonium-nitrate propellant degraded following exposure to moisture, the same process that NHTSA identified – more than ten years later – as the cause of hundreds of field ruptures.

> ### D. Ford Adopted the Use of Desiccant in Certain Takata Inflators, but Failed to Recall Non-Desiccated Inflators in Its Vehicles on the Road and Continued to Put Non-Desiccated Inflators from Takata into its Vehicles

63.     As a countermeasure to the multiple failures of the Takata inflators during testing, Ford proposed the idea of adding a desiccant (a drying agent) to the inflators.  The intention was for the desiccant to attract moisture away from the propellant and towards the desiccant.  Ford

16

understood that the desiccant had a capacity limit, at which point it would cease to absorb water and could release moisture back into the propellant. Nonetheless, Ford approved the use of desiccated PSDI-5 inflators in its airbag modules and used them in certain Ford vehicles beginning in 2005. However, Ford realized that this desiccant only delayed the degradation process, and the PSDI-5 inflators have also now been recalled as a result.

64. Despite its knowledge that the Takata inflators installed previously in its vehicles and in vehicles still in production contained non-desiccated ammonium nitrate-based propellant, Ford did not take steps to recall the Takata inflators in the field. In fact, Ford continued to install non-desiccated airbag inflators in its vehicles through 2014.

### E. Ford Knew Ruptures of Takata Inflators Had Occurred in the Field and Knew Other Auto Makers Were Recalling Takata Inflators

65. Ford tracked public incidents and recalls involving Takata airbags and was well aware of the escalating numbers of ruptures and recalls resulting from the Inflator Defect.

66. Any cursory attention paid to Takata's track record should have further fueled Ford's concern over ammonium nitrate inflators. Takata airbags made it to market in model year 2001. By 2003, there were two ruptures, including one that lead to a fatality in Arizona.

67. Additional, alarming incidents continued to mount regularly, including a rupture in 2004 in Alabama, and a trio of incidents in the summer of 2007. These four incidents took place in Honda vehicles, and notably, Honda filed a standard report with U.S. safety regulators for each of them.

68. Had it acted as a reasonable automaker, Ford would have stopped equipping its vehicles with dangerous Takata airbags after these incidents. Moreover, by November 2008 – well after Ford had accumulated significant knowledge regarding the troubling risks of Takata airbags – Honda issued its first public recall in the United States. The recall notice expressly noted the

risk that Takata airbags "could produce excessive internal pressure," causing "the inflator to rupture," and/or spraying metal fragments through the airbag cushion ("2008 Recall"). Coupled with its ongoing concerns over this precise risk, Ford had every obligation to act swiftly to protect their past and prospective consumers, and yet they did not.

69. Tragically, this failure would then be repeated serially over the next five years. Following the 2008 Honda recall, additional ruptures took place, many causing accidents, injuries, and/or fatalities. By 2009, Honda had issued its second recall in the United States, putting Ford on still further notice of the Inflator Defect. This pattern of incidents and recalls continued unabated – with increasingly large recalls of Takata airbags issued in 2010, 2011, and 2013 – and yet prompted no response from Ford. Stunningly, Ford continued to equip its vehicles with dangerous Defective Inflators and concealed its knowledge of the Inflator Defect from consumers and regulators.

70. Ford employees were well aware in late 2008 and early 2009 that Honda vehicles were being recalled because Takata inflators could rupture and cause serious injury to vehicle occupants from metal shrapnel.

71. Ford engineers recognized that, as the Takata inflators aged in Ford vehicles, the inflators could exhibit the same condition present in the Takata inflators in Honda vehicles that were subject to recall. When told by Takata that the recall of Honda vehicles did not affect Ford vehicles with Takata inflators, Ford did not accept Takata's explanation. Yet Ford would still wait years before it initiated any safety recall of its own.

72. Additionally, by August 2009, Ford was aware that ruptures of Takata inflators in Honda vehicles had caused at least one death.

73.     And by July 2010, Ford was aware that Nissan was also recalling vehicles with Takata inflators due to the same risk of rupture.

## F.  Ford Also Knew that a Safer Alternative Propellant Was Available

74.     As early as 2001, Ford received a presentation from one of Takata's competitors regarding the advantages of an alternative propellant-guanidine nitrate (GuNi) over ammonium nitrate.  Among the comparative advantages described were "low ballistic variability" and "improved thermal stability at elevated temperatures."

75.     At a meeting in 2005, Ford questioned Takata why it was not developing a nonammonium nitrate based propellant and recognized that Takata's competitors used other types of propellants, including GuNi, that required fewer deviations from the USCAR Specifications.

76.     In an October 2010 meeting between Ford and Takata, a Ford engineer directly told Takata that he was "concerned that AN [ammonium nitrate] has issues with phase stability and moisture sensitivity."  In addition, a Ford engineer mentioned, there was a perception that the GuNi propellant offered more advantages than ammonium nitrate, but was more expensive. In fact, by that point in time, the European Union (E.U.) was demanding non-ammonium-nitrate propellants for future vehicle programs in the E.U.

## G.  Despite Its Knowledge, Ford Delayed Recalling Its Vehicles

77.     By 2013, in addition to the above, Ford was aware that (a) the Takata AN inflators had experienced at least a dozen ruptures in the field; and (b) the Takata AN inflators were associated with vehicle recalls by Honda, Toyota, Nissan and Mazda.

78.     On April 11, 2013, Takata filed a Defect Information Report ("DIR") titled "Certain Airbag Inflators Used as Original Equipment."  While it sought to contain the scope of the problem, it again openly admitted concerns over propellant moisture absorption and deterioration, as well

as "over-aggressive combustion" and inflator "rupture." Shortly thereafter, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags. Ford, by contrast, remained silent.

79.     It was not until 2014, however, that Ford finally issued a very limited recall of its vehicles that contained Takata airbag inflators. In fact, Ford would not even agree with NHTSA to term it a "Safety Recall," and instead misleadingly identified it as a "Field Service Action." On June 19, 2014, Ford recalled its 2005-2008 Ford Mustangs, 2005-2006 Ford GTs, and 2004-2005 Ford Rangers. The "Field Service Action" was limited to vehicles purchased in "high absolute humidity areas," which included Florida, Hawaii, Puerto Rico, and the U.S. Virgin Islands. The recall amounted to less than 60,000 vehicles.

80.     In response to public scrutiny and pressure from NHTSA and private plaintiffs, Ford, along with other automakers, was forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags. This testing confirmed what Ford already knew: Takata's airbags containing ammonium nitrate were defective and prone to over-aggressive deployment and rupture.

81.     On October 22, 2014, NHTSA expanded the recall list to cover ten automakers and 7.8 million vehicles, over 5 million of which were Hondas. In a Consumer Advisory dated October 22, 2014, NHTSA sent an urgent warning to the owners of the now "7.8 million Affected Vehicles":

> The National Highway Traffic Safety Administration urges owners of certain Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas:

Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Georgia, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

82.     On October 29, 2014, NHTSA sent letters to ten automakers regarding the safety risks posed by the Takata airbags.  The letter stated that "[t]he ongoing cooperation of all manufacturers who have recalled vehicles is essential to address this safety risk," and that the "NHTSA team is engaged with you in critical work to better understand the failures and take action to remedy the safety risk…."  NHTSA's letter also asked the automakers to provide NHTSA with information as to their recall process, urged a faster response from them, and stated that "more can and should be done as soon as possible to prevent any further tragedies."

83.     By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient.  NHTSA therefore demanded a national recall from many automakers and began speaking out more forcefully against those automakers' endless delay and intransigence in the face of a deadly risk.

84.     Ford's disinterest in expending resources to protect its customers continued to stand out.  Whereas Honda announced an advertising campaign in March 2015 to promote the recall – a step it could and should have taken a decade ago – Ford could not be bothered with even that belated step.

85.     On May 18, 2015, Takata filed four DIRs with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver airbag inflators; (2) SPI passenger airbag inflators; (3) PSPI-L passenger airbag inflators; and (4) PSPI passenger airbag inflators, respectively.  Takata admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators."  In testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to

21

the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.

86.     At this juncture, Ford could have easily taken the obvious step of discontinuing use of ammonium nitrate, in addition to immediate, complete recalls, even if the DIRs did not yet implicate all ammonium-nitrate inflators.  It did not.  Takata would go on to issue additional DIRs, including in January 2016, January 2017, and January 2018.

87.     As a result of Takata's admission that its inflators are defective, the total number of recalled vehicles nationwide will exceed 40 million.

88.     In connection with the June 2014 recall, Ford informed NHTSA that it had searched its databases and had not found any reported inflator ruptures due to humidity.  Ford, however, failed to inform NHTSA that it was aware of the multiple ruptures during DV testing and PV testing of Takata inflators that had occurred in 2004, and that it was aware that a root cause of those ruptures was determined to be exposure to moisture.  Around that same time, Ford transferred one of its inflator experts, who had previously raised concerns about the use of ammonium nitrate, off projects involving inflators and the recall.

89.     Only a couple of months after the "Field Service Action," a rupture occurred in a 2007 Ford Mustang outside of the "high absolute humidity" areas.  It was not until after this incident that Ford was prompted to expand the recall of 2005-2008 Ford Mustangs to be national in scope in December 2015.

90.     Similarly, it was not until an additional incident occurred in the field – this time with fatal consequences – that Ford again expanded its recalls.

91.     On December 22, 2015, an individual named Joel Knight, age 52, was driving his 2006 Ford Ranger in South Carolina when he hit a stray cow in the road.  His Takata airbag deployed and ruptured, expelling a piece of shrapnel that severed his spinal cord and killed him.

92.     Ford, again reacting only after an incident in the field, expanded its recalls in January 2016 to include the 2006 Ford Ranger that Mr. Knight had been driving.

93.     As a result of Takata's admission that its inflators are defective, in January of 2017, Ford expanded its recall to 816,000 Ford, Lincoln, and Mercury vehicles made in North America, including 654,695 sold in the U.S.  Although most vehicles were included in prior recall actions, the new recall added the passenger-side airbag inflators.

94.     On January 13, 2017, Takata pleaded guilty to deceiving automakers about the safety of its airbags.

95.     In March of 2017, Ford recalled another 32,000 2016-17 Ford Edge, 2016-17 Lincoln MKX and 2017 Lincoln Continental vehicles to replace the driver frontal airbag module, and expended the recall yet again in July of 2017.

96.     In January of 2018 the NHTSA issued an advisory urging owners of 2006 Ford Ranger pickup trucks to stop driving them after it confirmed a second Takata airbag-related death involving the 2006 Ford Ranger, and in February of 2018 issued a rare stop-driving recall affecting 30,603 2006 Ford Ranger vehicles their defective airbags are replaced.

97.     In January of 2019, Ford expended its recall yet again by recalling 782,384 Ford, Lincoln, and Mercury vehicles to have their passenger-side front airbag inflators replaced.

98.     Over the past 17 years that Ford and its supplier have known there was a problem with the safety of their airbags, there have been at least 22 deaths and hundreds of injuries linked to the Defective Airbags worldwide.  As detailed above, the incidents date back to at least 2003.

In fact, in just the past several years, Ford has received numerous reports of rupture and aggressive-deployment incidents in its vehicles involving Takata airbags. Ford knew of the Inflator Defect by virtue of these incidents – among many other sources of knowledge – but failed to disclose the nature and scope of the Inflator Defect.

99.     Ford was on further notice due to additional, unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use. A review of publicly available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the subject vehicles, events that may be tied to the unstable and volatile ammonium-nitrate propellant. These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota. Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both).

100.     In light of recalled vehicles reaching over 34 millions, and due to unavailability of parts, consumers found themselves in the frightening position of having to drive dangerous vehicles for many years while they wait for Ford to replace the defective airbags in their cars. For example, Ford has recommended owners prohibit anyone from riding in the passenger seat until the defective passenger side airbag is replaced. As a result, many consumers were effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

101.     The risk of injury to Ford's customers and the occupants of Ford vehicles remains very real and is exacerbated by Ford's poor and delayed execution of the recalls.

**IV.     Ford Sold Its Vehicles As "Safe" and "Reliable"**

102.    At all relevant times, in advertisements and promotional materials, Ford continuously maintained that its vehicles were safe and reliable.  Plaintiffs, directly or indirectly, viewed or heard such advertisements or promotional materials prior to purchasing or leasing Defective Vehicles.  The misleading statements about Defective Vehicles' safety in Ford's advertisements and promotional materials, as well as Ford's omissions regarding the Inflator Defect, were material to decisions to purchase or lease Defective Vehicles.

103.    Examples of Ford's safety and reliability representations, from 2000 through the present, include the following:

a.    In 2004, Ford declared on its website that new NHTSA standards permitted it to "design [airbag] systems that can help further reduce airbag inflation injury risks for a broader range of front-seat occupants," and that "Ford Motor Company continues to design vehicles with a high level of occupant protection."

b.    In brochures for the 2004 Ford Ranger, Ford advertised that front driver and passenger airbags were standard features of the vehicle.

c.    In 2006, Ford represented in brochures that its cars possessed "up-to-the-minute safety and security systems help protect you and your passengers out there on the road."

d.    In 2006, Ford also represented in brochures that its cars contained a: "Personal Safety System®," which "enhances protection for the driver and front passenger in certain frontal collisions. The system customizes the deployment of the dual-stage front airbags based on several criteria, including the driver's seat position, whether the front safety belts are in use, the amount of pressure exerted on the front-passenger's seat, and the overall severity of the impact."

e. In 2009, Ford represented on its website that its "new safety technologies enhance the performance of safety belts and airbags," and "reduce the risk of injury to the driver and right-front passenger in the event of a moderate to severe frontal collision."

f. In 2015, Ford represented on its website: "At Ford, we hold ourselves to very high standards for vehicle safety. The fact is, vehicle safety is a critical part of our brand promise to Go Further. We aim to give customers peace of mind and make the world safer by developing advanced safety technologies and making them available across a wide range of vehicles."

g. Throughout the relevant time period, Monroney window stickers on Plaintiffs' vehicles listed "Dual Front & Side Airbags" as "Safety/Security" features of the vehicles, without disclosing the defective nature of the airbags."

**FACTUAL ALLEGATIONS APPLICABLE TO INDIVIDUAL PLAINTIFFS**

104. As a result of Ford's misconduct, Plaintiffs were harmed and suffered actual damages. The defective Takata airbags significantly diminish the value of the vehicles in which they are installed.

105. Plaintiff Brian K. Willis and all Plaintiffs identified in <u>Exhibit A</u> purchased their Defective Vehicles primarily for personal, family, and household use. Plaintiff Brian K. Willis and all Plaintiffs identified in <u>Exhibit A</u> were harmed and suffered actual damages. The defective Takata airbags significantly diminish the value of the vehicles in which they are installed. Such vehicles have been stigmatized as a result of being recalled and equipped with Takata airbags, and the widespread publicity of the Inflator Defect.

106. Further, Plaintiff Brian K. Willis and all Plaintiffs identified in <u>Exhibit A</u> did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Plaintiff Brian K. Willis and all Plaintiffs identified in <u>Exhibit A</u> paid, either through a higher purchase price or higher lease payments, more than they would have had the Inflator Defect been disclosed. Plaintiff Brian K. Willis and all Plaintiffs identified in <u>Exhibit A</u> were deprived of having a safe, defect-free airbag installed in their vehicles, and Ford unjustly benefited from its unconscionable delay in recalling its defective products, as it avoided incurring the costs associated with recalls and installing replacement parts for many years.

107. Plaintiff Brian K. Willis and all Plaintiffs identified in <u>Exhibit A</u> also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

108. The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiff Brian K. Willis and all Plaintiffs identified in <u>Exhibit A</u>.

## <u>TOLLING OF STATUTES OF LIMITATIONS</u>

### I. **Fraudulent Concealment Tolling**

109. Upon information and belief, Takata has known of the Inflator Defect in its Defective Airbags since at least 1990s. Prior to installing the Defective Airbags in its vehicles, Ford knew or should have known of the Inflator Defect, because Takata informed Ford that the Defective Airbags contained the volatile and unstable ammonium nitrate. In addition, Ford was made aware of the Inflator Defect in Takata's airbags no later than 2004, when airbags ruptured

27

during safety testing. And Ford again was made aware of the Inflator Defect in Takata's airbags no later than 2008, when Honda began issuing recalls for airbag ruptures. Ford has concealed from or failed to notify Plaintiffs and the public of the full and complete nature of the Inflator Defect.

110.    Although Ford has now acknowledged to safety regulators that many of Takata's airbags are defective, for years, Ford did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

111.    Any applicable statute of limitations has therefore been tolled by Ford's knowledge, active concealment, and denial of the facts alleged herein.

## II.    Discovery Rule Tolling

112.    The causes of action alleged herein did not accrue until Plaintiffs discovered that their vehicles had the airbags with Inflator Defect.

113.    Plaintiffs, however, had no realistic ability to discern that the vehicles were defective until – at the earliest – after either the defective airbag exploded or their vehicles were recalled. And even then, Plaintiffs had no reason to discover their causes of action because of Ford's active concealment of the true nature of the defect.

## III.    Estoppel

114.    Ford was under a continuous duty to disclose to the Plaintiffs the true character, quality, and nature of the subject vehicles.

115.    Ford knowingly, affirmatively, and actively concealed the true nature, quality, and character of the subject vehicles from Plaintiffs, and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles.

28

116. Plaintiffs reasonably relied upon Ford's knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, Ford is estopped from relying on any statute of limitations in defense of this action.

## IV. Class Action Tolling

117. All Plaintiffs opted out of the class action settlement reached in *Koehler, et al. v. Takata Corporation, et al.* (Case No. 1:14-cv-24009; MDL No. 2599).

118. The statutes of limitation applicable to Plaintiffs' claims are tolled by class action tolling in light of the *Koehler, et al. v. Takata Corporation, et al.* (Case No. 1:14-cv-24009) Complaint, filed October 27, 2014, and Second Amended Complaint, filed June 15, 2015. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350, 103 S. Ct. 2392, 2396 (1983) ("The filing of a class action tolls the statute of limitations 'as to all asserted members of the class'").

## FIRST CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability Pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.*

119. The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

120. The Plaintiffs are each a "consumer" as defined in 15 U.S.C. § 2301(3).

121. Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5), and is a merchant with respect to motor vehicles.

122. The subject vehicles are each a "consumer product" as defined in 15 U.S.C. § 2301(6).

123. The subject vehicles were each subject to implied warranties of merchantability running from the Defendant to the Plaintiffs.

124.     The Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(1), provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

125.     Defendant provided Plaintiffs with an implied warranty of merchantability in connection with the purchase or lease of its vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).  As a part of the implied warranty of merchantability, Defendant warranted that the subject vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

126.     The subject vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used, because they are fitted with Defective Airbags containing the Inflator Defect which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyperaggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

127.     Defendant breached these implied warranties, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1).  Without limitation, the subject vehicles share a common design defect in that they are equipped with Defective Airbags containing the Inflator Defect. Defendant has admitted that the subject vehicles are defective in issuing its recalls.

128.     Any efforts to limit the implied warranties in a manner that would exclude coverage of the subject vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the subject vehicles is null and void.

129. Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between the Defendant, on the one hand, and Plaintiffs, on the other.

130. Any limitations on the warranties are substantively unconscionable. Defendant knew that the subject vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Defendant failed to disclose the Inflator Defect to Plaintiffs. Thus, the Defendant's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

131. Furthermore, affording the Defendant an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each subject vehicle, Defendant knew, should have known, or was reckless in not knowing of its misrepresentations concerning the subject vehicle's inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, any requirement that Plaintiffs provide Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

132. Nevertheless, Plaintiffs notified Defendant of the Airbag Defects in the subject vehicles within a reasonable time after Plaintiffs discovered them, but Defendant failed to cure the defect within reasonable time.

133. Plaintiffs would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because the Defendant is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs have not re-accepted their defective vehicles by retaining them.

134. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs

seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs in connection with the commencement and prosecution of this action.

## SECOND CAUSE OF ACTION
### Unjust Enrichment

135. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

136. Defendant has received and retained a benefit from the Plaintiffs and inequity has resulted.

137. Defendant benefitted through its unjust conduct, by selling subject vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these vehicles were worth, to Plaintiffs, who overpaid for these vehicles, and/or would not have purchased these vehicles at all; and who have been forced to pay other costs.

138. It is inequitable for Defendant to retain these benefits.

139. Plaintiffs do not have an adequate remedy at law.

140. As a result of Defendant's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### Fraudulent Concealment

141. The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

142. Defendant concealed and suppressed material facts regarding the subject vehicles – most importantly, the fact that they were equipped with Defective Airbags which, among other

32

things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

143.    Defendant took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

144.    Defendant had a duty to disclose the Inflator Defect because it:

      a.    Had exclusive and/or far superior knowledge and access to the facts, and Defendant knew the facts were not known to or reasonably discoverable by the Plaintiffs;

      b.    Intentionally concealed the foregoing from the Plaintiffs; and/or

      c.    Made incomplete representations about the safety and reliability of the subject vehicles, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

145.    These omitted and concealed facts were material because they would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the subject vehicles purchased or leased by the Plaintiffs. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Indeed, Plaintiffs trusted Defendant not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

146.    Defendant concealed and suppressed these material facts in order to falsely assure purchasers and consumers that its vehicles were capable of performing safely as represented by Defendant and reasonably expected by consumers.

147. Defendant actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Defendant money, and it did so at the expense of the Plaintiffs.

148. Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

149. Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they own vehicles that diminished in value as a result of Defendant's concealment of, and failure to timely disclose, the serious Inflator Defect in hundreds of thousands of its vehicles and the serious safety and quality issues caused by Defendant's conduct.

150. Had they been aware of the Defective Airbags installed in their vehicles, and the Defendant's callous disregard for safety, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendant's fraudulent concealment.

151. The value of the subject vehicles has diminished as a result of Defendant's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the subject vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

152. Accordingly, Defendant is liable for Plaintiffs' damages in an amount to be proven at trial.

153. Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being, and with the aim of enriching Defendant. Defendant's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety,

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FOURTH CAUSE OF ACTION**
**Violation of the North Carolina Unfair or Deceptive**
**Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq*.**

154.    The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

155.    The purpose of the North Carolina Unfair or Deceptive Trade Practices Act ("NCUDTPA") is to deter sellers from making false and misleading representations in order to protect the public such as those that mislead consumers about the nature and condition of the product they are receiving.

156.    North Carolina has declared unlawful "unfair or deceptive acts or practices in or affecting commerce… ." N.C. Gen. Stat. § 75-1.1(a).

157.    Defendant's conduct was "in or affecting commerce" under N.C. Gen. Stat. § 75-1.1(a)-(b) because Defendant advertised, offered for sale, sold, leased, and/or distributed the subject vehicles in the United States, including North Carolina, directly or indirectly affecting North Carolina citizens.

158.    All Plaintiffs sought and acquired the subject vehicles by purchase or lease as a result of Defendant's representations.

159.    The allegations set forth herein constitute deceptive sales practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*.

160.    Specifically, in the course of its business, Defendant failed to disclose and actively concealed the dangers and risks posed by the subject vehicles and/or Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Defendant also engaged in unlawful trade practices by employing deception, deceptive

35

acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the subject vehicles and/or the Defective Airbags installed in them.

161. Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in its vehicles, Defendant knew or should have known of the Inflator Defect, because Takata informed it that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendant approved Takata's designs. In addition, Honda was made aware of the Inflator Defect in the Takata airbags in Honda's vehicles in 2004, following a rupture incident. And Defendant was again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags.

162. By intentionally failing to disclose and by actively concealing the Inflator Defect in the subject vehicles and/or the Defective Airbags installed in them, by permitting the subject vehicles to be marketed as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that values safety, Defendant engaged in an unconscionable act or practice under NCUDTPA because, to the detriment of Plaintiffs, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree. That unconscionable act or practice was a producing cause of the economic damages sustained by Plaintiffs. Defendant deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the subject vehicles.

163.     In the course of the Defendant's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above.  Defendant compounded the deception by repeatedly asserting that the subject vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

164.     Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of subject vehicles and/or the Defective Airbags installed in them, the quality of Defendant's brand, and the true value of the subject vehicles.

165.     Defendant intentionally and knowingly misrepresented material facts regarding the subject vehicles and/or the Defective Airbags installed in them with an intent to mislead the Plaintiffs.

166.     Defendant knew or should have known that its conduct was in violation of NCUDTPA.

167.     Defendant made material statements about the safety and reliability of the subject vehicles and/or the Defective Airbags installed in them that were either false or misleading.

168.     To protect its profits and to avoid remediation costs and a public relations nightmare, Defendant concealed the dangers and risks posed by the subject vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the subject vehicles, and allowed them to continue driving highly dangerous vehicles.

37

169. Defendant owed Plaintiffs a duty to disclose the true safety and reliability of the subject vehicles and/or the Defective Airbags installed in them because the Defendant:

a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b. Intentionally concealed the foregoing from Plaintiffs; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

170. Because Defendant fraudulently concealed the Inflator Defect in the subject vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the subject vehicles has greatly diminished. In light of the stigma attached to the subject vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

171. Defendant's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in the subject vehicles were material to the Plaintiffs. A vehicle containing components produced by a reputable manufacturer is worth more than an otherwise comparable vehicle containing critical safety components made by a disreputable manufacturer of unsafe products that conceals defects rather than promptly remedies them.

172. Plaintiffs suffered ascertainable loss caused by Defendant's misrepresentations and its failure to disclose material information. Had they been aware of the Inflator Defect that existed in the subject vehicles and/or the Defective Airbags installed in them, and the Defendant's complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendant's misconduct.

173.     Defendant's violations present a continuing risk to the Plaintiffs, as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

174.     Plaintiffs have provided adequate notice to Defendant.

175.     As a direct and proximate result of the Defendant's violations of NCUDTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

176.     Plaintiffs seek monetary relief against Defendant in the amount of actual damages, as well as punitive damages because Defendant acted with fraud and/or malice and/or was grossly negligent.

177.     Plaintiffs also seek an order enjoining Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under NCUDTPA.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs demand judgment against Defendant as follows:

a.  An order approving revocation of acceptance of the subject vehicles;

b.  Money damages, in the form of a refund of the full contract prices, including, trade-in allowance, taxes, fees, insurance premiums, interest, and costs, and a refund of all payments made by Plaintiffs on the subject contracts;

c.  Equitable relief including, but not limited to, replacement of the subject vehicles with new vehicles, or repair of the defective subject vehicles with an extension of the express and implied warranties, and service contracts which are or were applicable to the subject vehicles, in the event that Plaintiffs are not found to be entitled to revocation;

d.   Incidental and consequential damages;

e.   Treble and punitive damages;

f.   Reasonable attorneys' fees; and

g.   Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Dated: February 20, 2020

Respectfully submitted,

By:    _/s/_  Lawrence B. Serbin
Lawrence B. Serbin, Esq., NC Bar# 38493
The Law Offices of Jason E. Taylor, P.C.
P.O. Box 2688
Hickory, NC 28603
Telephone: (800) 351-3008
Facsimile: (704) 676-1094
*Attorneys for Plaintiffs*